### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD)(SN) |

This document relates to:

*Susan M. King, et al. v. Islamic Republic of Iran*, No. 1:22-cv-05193 (GBD) (SN)

### NON-U.S. NATIONAL PLAINTIFF MANU DHINGRA'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR FINAL JUDGMENT AS TO LIABILITY AND FOR PARTIAL FINAL JUDGMENT FOR DAMAGES AGAINST THE ISLAMIC REPUBLIC OF IRAN

ANDERSON KILL P.C.
Jerry S. Goldman, Esq.
Bruce E. Strong, Esq.
Alexander Greene, Esq.
1251 Avenue of the Americas
New York, NY 10020
Tel:     (212) 278-1000
Fax:     (212) 278-1733
Email:  jgoldman@andersonkill.com
          bstrong@andersonkill.com
          agreene@andersonkill.com

*Attorneys for Plaintiffs*

Dated:  New York, New York
            June 23, 2023

## <u>TABLE OF CONTENTS</u>

**Page**

INTRODUCTION ................................................................................................ 1

DISCUSSION ..................................................................................................... 4

I.      PROCEDURAL BACKGROUND ............................................................ 4

      A.      Applicable Orders ........................................................................... 4

      B.      Related Cases .................................................................................. 5

      C.      Iran Was Duly Served and Default Was Duly Entered ................... 7

            1.      Service by Mail Was Not Successful ................................... 7

            2.      Iran Was Served Via Diplomatic Means .............................. 9

            3.      The Clerk Properly Entered Default Against Iran. .............. 11

II.     THE PERSONAL INJURY PLAINTIFF REQUESTS CLARIFICATION THAT THE SURVIVAL CLAIM INCLUDES CAUSES OF ACTION FOR ASSAULT AND BATTERY AGAINST IRAN ......................................................... 12

III.    THE COURT HAS SUBJECT-MATTER JURISDICTION OVER THE PERSONAL INJURY PLAINTIFF'S CLAIMS AGAINST IRAN UNDER JASTA ..................................................................................................... 14

IV.     IRAN IS LIABLE TO THE PERSONAL INJURY PLAINTIFF UNDER NEW YORK LAW. ............................................................................................. 17

      A.      Iran Is Liable to the Personal Injury Plaintiff for Assault and Battery Under New York Law, Which Applies Because He Was Injured At The World Trade Center. ......................................................................... 18

V.      THE COURT SHOULD ENTER DAMAGES AWARDS AGAINST IRAN AND IN FAVOR OF THE PERSONAL INJURY PLAINTIFF IN AMOUNTS PREVIOUSLY AUTHORIZED. ................................................................ 20

      A.      Personal Injury Damages - Pain and Suffering ............................. 20

            1.      Manu Dhingra ...................................................................... 21

                - Dhingra's Life Before 9/11 - ……………………………………………...22

                - September 11 - ....................................................................... 24

i

**TABLE OF CONTENTS**
*(continued)*

                                                                      **Page(s)**

- The Doctors Save Manu's Life - ............................................................ 26

- Manu's Partial Recovery - ..................................................................... 28

- Psychological Impacts - ........................................................................ 29

- The Court Should Award Manu Dhingra *Twelve Million Dollars*
      in Personal Injury Damages - ........................................................... 31

- Economic Damages in the Amount of *$255,582* Should be
      Awarded to Plaintiff Dhingra - ......................................................... 33

B.     Punitive Damages ................................................................................... 33

C.     Prejudgment Interest .............................................................................. 34

VI.   CONCLUSION................................................................................................. 36

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Ashton v. al Qaeda Islamic Army,*
  02-CV-6977 (GBD)(SN) ................................................................ *passim*

*Baker v. Socialist People's Libyan Arab Jamahirya,*
  775 F. Supp. 2d 48 (D.D.C. 2011) ..........................................................34

*Bank of New York v. Yugoimport,*
  745 F.3d 599 (2d Cir. 2014) ...............................................................17

*Bauer v. Al Qaeda Islamic Army,*
  02-CV-7236 (GBD)(SN) ..........................................................4, 7, 35

*Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.,*
  137 S. Ct. 1312 (2017) ..........................................................................15

*Burnett v. Islamic Republic of Iran,*
  No. 15-CV-9903 (GBD) (SN) (S.D.N.Y. Feb. 8, 2016), ECF No. 53 ........................... *passim*

*Cassirer v. Thyssen-Bornemisza Collection Found.,*
  No. 20-1566, 2022 WL 1177497 (U.S. Apr. 21, 2022) ........................................17

*Est. of Heiser v. Islamic Republic of Iran,*
  466 F. Supp. 2d 229 (D.D.C. 2006) ...........................................................6

*Fed. Republic of Germany v. Philipp,*
  141 S. Ct. 703 (2021) ............................................................................14

*Fugazy v. Corbetta,*
  34 A.D.3d 728 (2006) ............................................................................18

*McKesson Corp. v. Islamic Republic of Iran,*
  672 F.3d 1066 (D.C. Cir. 2012) ...............................................................15

*Reed v. Islamic Republic of Iran,*
  845 F. Supp. 2d 204 (D.D.C. 2012) ..........................................................11

*In re Sept. 11 Litig.,*
  802 F.3d 314 (2d Cir. 2015) ...................................................................35

*Shapiro v. Republic of Bolivia,*
  930 F.2d 1013 (2d Cir. 1991) ..................................................................11

iii

# TABLE OF AUTHORITIES
## *(continued)*

**Page(s)**

*Susan M. King, et al. v. Islamic Republic of Iran,*
No. 1:22-cv-05193 (GBD) (SN) ..................................................................2, 9, 10, 12

*In re Terrorist Attacks on Sept. 11, 2001,*
No. 03 MDL 1570 (GBD), 2011 WL 13244047 (S.D.N.Y. Dec. 22, 2011)
(ECF No. 2515)..................................................................................16, 17, 18, 19

*In re Terrorist Attacks on September 11, 2001,*
03-md-1570 ......................................................................................................5, 6, 34

*Valore v. Islamic Republic of Iran,*
700 F. Supp. 2d 52 (D.D.C. 2010) ............................................................................7

**Statutes**

28 U.S.C. § 1602..............................................................................................................9, 10

28 U.S.C. § 1604..................................................................................................................15

28 U.S.C. § 1605A.......................................................................................................*passim*

28 U.S.C. § 1606..................................................................................................................17

28 U.S.C. § 1608.........................................................................................................*passim*

49 U.S.C. § 40101................................................................................................................35

Air Transportation Safety and System Stabilization Act ("ATSSSA").  Pub. L.
No. 107-42, 115 Stat. 230 (2001) (codified as amended at 49 U.S.C. § 40101) ...................35

Terrorism Act, Pub. L. 114-222..........................................................................................4

**Other Authorities**

Fed. R. Civ. P. 55(a) ...........................................................................................................11

## INTRODUCTION

A discrete number of non-U.S. Nationals were murdered during the September 11, 2001 attacks. The undersigned represents citizens from many nations who seek parity with their U.S. National counterparts.  Terrorism does not distinguish based on citizenship nor should this Court. Non-U.S. Nationals killed on 9/11 and their immediate family members who were not U.S. Nationals on 9/11 bring this motion for judgment of default against the Islamic Republic of Iran ("Iran").

For the reasons set forth below, the statements contained in the Declaration of Jerry S. Goldman, Esq., with exhibits appended thereto ("Goldman Declaration"), which is being filed contemporaneously with this Memorandum of Law, as well as those set forth in prior motions for damages made on behalf of other *O'Neill* wrongful death plaintiffs, non-U.S. National Plaintiff Manu Dhingra who is identified in Exhibit A (the "Personal Injury Plaintiff") to the Goldman Declaration by and through their counsel, Anderson Kill P.C., respectfully moves this Court for an Order:

(1)      clarifying that the cause of action for survival in Amended Complaint, *Burnett v. Islamic Republic of Iran*, No. 15-CV-9903 (GBD) (SN) (S.D.N.Y. Feb. 8, 2016), ECF No. 53 (individual case docket),[1] as adopted in the short-form complaint in *Susan M. King, et al. v. Islamic Republic of Iran*, No. 1:22-cv-05193 (GBD) (SN) ("*King*"), ECF No. 1 (individual case docket), is a cause of action for both assault and battery upon which the Personal Injury Plaintiff may move for a damages judgment; AND,

---

[1] All ECF numbers are to the MDL docket unless stated otherwise.

(2)      determining that service of process in *Susan M. King, et al. v. Islamic Republic of Iran*, No. 1:22-cv-05193 (GBD) (SN) was properly effected upon Iran in accordance with 28 U.S.C. § 1608(a) for sovereign defendants; AND,

(3)      finding that the Court has subject-matter jurisdiction over the common law claims of the Personal Injury Plaintiff pursuant to 28 U.S.C. § 1605B; AND,

(4)      determining that this Court has subject-matter jurisdiction over Iran under the common law for actions arising out of assault and battery based on the intentional acts of international terrorism perpetrated on September 11, 2001 that intentionally targeted innocent civilians resulting in personal injury; AND

(5)      entering judgments as to liability for the Personal Injury Plaintiff for his common law claims; AND,

(6)      awarding a compensatory damages judgment to the Personal Injury Plaintiff against Iran for assault and battery commensurate with the injuries sustained during the September 11, 2001 terrorist attacks, in accordance with prior precedent in the U.S. District Court for the District of Columbia in similar cases (and factoring in an upward departure on damages values based on the indelible impact of the September 11, 2001 terrorist attacks); AND,

(7)      awarding the Personal Injury Plaintiff identified in Exhibit A, an award of economic damages in the amount set forth in Exhibit A; AND,

(8)      awarding the Personal Injury Plaintiff prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment for damages; AND,

(9)      granting the Personal Injury Plaintiff permission to seek punitive damages, economic damages, and other appropriate damages, at a later date; AND,

(10)     granting permission for all other Plaintiffs in these litigations not appearing in Exhibit A to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed; AND,

(11)     granting to the Personal Injury Plaintiff such other and further relief as this honorable court deems just and proper.

The Personal Injury Plaintiff sued Iran in connection with the injuries he sustained in the 9/11 attacks. The Personal Injury Plaintiff now seeks to clarify that the survival count in the operative pleading in *King* should also include causes of action for assault and battery in that it seeks to hold Iran liable for its "intentional, malicious, reckless, conspiratorial, criminal, grossly negligent and negligent acts" that placed plaintiffs, including the Personal Injury Plaintiff, "in a severe, often prolonged, extreme, traumatic, apprehension of harmful, offensive unwarranted bodily contact, injury and assault." The count also states that plaintiffs "suffered intensely severe and offensive harmful bodily contact, personal injury and battery; including but not limited to extreme fear, terror, anxiety, emotional and psychological distress, knowledge of pending . . . physical and emotional trauma, intentionally inflicted physical pain." *See* ECF 53 at ¶ 5068, incorporated by reference into ECF No. 1 at ¶ 3. *See infra*, pp. 12-14.  A liability determination and default judgment as to his common law claims of assault and battery then logically follows.

The only material difference between the thousands of Plaintiffs with damages judgments against Iran and the Personal Injury Plaintiff, is that the Personal Injury Plaintiff were not U.S. Nationals on September 11, 2001. Nonetheless, the Personal Injury Plaintiff's claims against Iran are fully supported by existing record evidence that should be applied to the Personal Injury Plaintiff's common law claims for assault and battery. Thus, this Court should extend its liability determination and enter damages judgments against Iran for the Personal Injury Plaintiff's

docs-100609782.1

common law claims in accordance with the Justice Against Sponsors of Terrorism Act, Pub. L.

114-222, now codified at 28 U.S.C. § 1605B ("JASTA"), and applicable common law.

## DISCUSSION

### I.    PROCEDURAL BACKGROUND

#### A.    Applicable Orders

This motion is being submitted in accordance with various procedural orders entered by

this Court, and the form of this motion and the relief requested herein are intended to comply

with various orders of this Court, including the following:

a.   The Court's January 24, 2017 Order, ECF No. 3435, requiring that "[a]ll
     further motions for final judgment against any defaulting defendant shall be
     accompanied by a sworn declaration attesting that the attorney has (1)
     complied with the due diligence safeguards [referenced in Section II.D. of the
     January 23, 2017 letter from the Plaintiffs' Executive Committee (ECF No.
     3433)] and (2) personally verified that no relief has previously been awarded
     to any plaintiff included in the judgment (or, if relief has been awarded, the
     nature of that relief)."

b.   The Court's October 14, 2016 Order, ECF No. 3363, concerning the amounts
     of solatium damage awards.

c.   The Court's October 14, 2016 Order, ECF No. 3362, related to *Bauer v. Al
     Qaeda Islamic Army*, 02-CV-7236 (GBD)(SN) and *Ashton v. al Qaeda
     Islamic Army*, 02-CV-6977 (GBD)(SN).

d.   The Court's October 28, 2019 Order, ECF No. 5234, setting forth updated
     procedural rules.

4

    e.   The Court's December 6, 2019 Order, ECF No. 5338, setting forth the scheduling order.

    f.   The Court's April 11, 2022 Order, ECF No, 7870, setting forth additional content to include in proposed orders.

    g.   The Court's May 5, 2022 Order, ECF No. 7963, setting forth procedures for filing expert reports submitted in support of default judgments.

**B.   Related Cases**

Relying on evidence and arguments[2] submitted by plaintiffs in *In re Terrorist Attacks on September 11, 2001*, 03-md-1570, the consolidated multidistrict litigation arising out of the September 11th attacks, this Court, on December 22, 2011, and again on August 31, 2015, granted Orders of Judgment on Liability in favor of certain of the *Havlish*, *Ashton*, *O'Neill*, *Federal Insurance*, and *Hoglan* groups of plaintiffs against Iran (*see* ECF Nos. 2516, 3014, 3016, 3020, 3020-23).  Subsequently, other liability findings were made for additional *O'Neill* plaintiffs. After granting *Havlish* plaintiffs' Order of Default Judgment on Liability, this Court considered the issue of damages suffered by the *Havlish* plaintiffs and their decedents. Upon the *Havlish* plaintiffs' submissions, on October 3, 2012 this Court found, among other things, that "Plaintiffs may recover for [, inter alia,] solatium…in an action under Section 1605A. 28 U.S.C. § 1605A(c)(4). In such an action, …family members can recover solatium for their emotional injury; and all plaintiffs can recover punitive damages." ECF No. 2623 at 2-3, quoting *Valore v.*

---

[2] In each of the Orders of Judgment regarding plaintiffs' claims against Iran in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, the Court premised its determination "[u]pon consideration of the evidence submitted by the Plaintiffs in filings with this Court on May 19, 2011, July 13, 2011, and August 19, 2011, and the evidence presented at the December 15, 2011, hearing on liability, together with the entire record in this case." ECF Nos. 2516, 3014, 3016, 3020-22; *see also* ECF No. 3023 (substantially similar language).

*Islamic Republic of Iran*, 700 F. Supp. 2d 52, 83 (D.D.C. 2010). This Court also found that the

following solatium awards for family members are appropriate, as an upward departure from the

framework in *Est. of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006).

| Relationship of Decedent | Solatium Award |
|---|---|
| Spouse | $12,500,000 |
| Parent | $8,500,000 |
| Child | $8,500,000 |
| Sibling | $4,250,000 |

ECF No. 2623 at 4.

The Court has applied the same solatium values to claims of other solatium plaintiffs in

*Burnett* (ECF Nos. 3666, 4023, 4126, 4146, 4175, 5061, 5062, 5087, 5138, and 5356) and other

solatium plaintiffs in other cases coordinated in the *In re Terrorist Attacks on September 11,*

*2001* multidistrict litigation. *See*, e.g., ECF Nos. 3175 at 2, 3300 at 1, 3358 at 9, 3363 at 16,

3399, and 3977 at 7.

In that same decision in *Havlish*, this Court also found that Plaintiffs are entitled to

punitive damages under the Foreign Sovereign Immunities Act ("FSIA") in an amount of 3.44

multiplied by their compensatory damages award. ECF No. 2623 at 5. The Court has applied that

3.44 multiplier also to judgments in *Ashton*. *See* ECF No. 3175 at 3 (Report and

Recommendation to apply 3.44 punitive multiplier); ECF No. 3229 at 1 (Order adopting in its

entirety Report and Recommendation to apply 3.44 punitive multiplier). The Court applied the

3.44 punitive multiplier to the compensatory awards previously awarded in *Burnett*. ECF No.

3666. However, in *Hoglan*, another case in this multidistrict litigation, Magistrate Judge Netburn

recommended that the plaintiffs' request for punitive damages be denied without prejudice. ECF

6

Nos. 3358 at 11-16, 3363 at 28. Judge Daniels adopted Magistrate Judge Netburn's Report and Recommendation in its entirety. ECF Nos. 3383 at 2, 3384 at 6.

In the *Havlish* decision, this Court also found that prejudgment interest was warranted for the Plaintiffs' solatium damages. ECF No. 2623 at 5. The *Havlish* plaintiffs sought application of a 4.96% interest rate, which the magistrate judge recommended (ECF No. 2619 at 13-14) and Judge Daniels adopted (ECF No. 2623 at 5). In *Ashton*, plaintiffs sought, and the magistrate judge recommended, application of a statutory nine percent simple interest rate for prejudgment interest. ECF No. 3175 at 7-8. Judge Daniels adopted the magistrate judge's report and recommendation and applied the nine percent interest rate in multiple instances in *Ashton* and *Bauer*. *See* ECF Nos. 3229 at 2; 3300 at 1, 3341 at 1. However, in *Hoglan*, Magistrate Judge Netburn recommended that the 4.96 percent rate for prejudgment interest should be applied to all solatium claims. ECF Nos. 3358 at 17-20, 3363 at 28-29. Judge Daniels adopted Judge Netburn's *Hoglan* Report and Recommendation in its entirety and applied an interest rate of 4.96 percent per annum, compounded annually. ECF Nos. 3383 at 2, 3384 at 6. The Court applied that interest rate, 4.96 percent per annum, to other plaintiffs' awards in *Burnett*.

**C.      Iran Was Duly Served and Default Was Duly Entered.**

Iran was duly served in this case. Service was effectuated as set forth below.

**1.      Service by Mail Was Not Successful**

Service on Iran could not be effected under 28 U.S.C. § 1608(a)(1) because the United States and Iran do not have any special arrangement for service of process, nor is service permitted by any applicable international convention under the provisions of subsection (2). *See Valore*, 700 F. Supp. 2d at 70.

Accordingly, the Personal Injury Plaintiff first attempted to serve Iran in accordance with Section 1608(a)(3) of the FSIA.  Section 1608(a)(3) provides that:

> if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned.

The Southern District of New York's Clerk's Office Foreign Mailing Instructions provide plaintiffs with instructions for service by U.S. Postal Service ("USPS"), FedEx, or DHL.  *See* United States District Court for the Southern District of New York Clerk's Office Foreign Mailing Instructions at 2.

On the dates set forth in the table below, the Personal Injury Plaintiff attempted to utilize DHL or USPS for service under § 1608(a)(3).[3] Pursuant to the Southern District of New York's Clerk's Office Foreign Mailing Instructions, the Personal Injury Plaintiff prepared an envelope along with the requisite service documents for the Clerk of the District Court as prescribed, and delivered a Service Packet[4] to the Clerk.  The Clerk of Court, in accordance with the Southern District of New York's Clerk's Office Foreign Mailing Instructions and 28 U.S.C. § 1608(a)(3), attempted to serve the Service Packet on Iran via DHL or USPS.[5]  As set forth in Jerry S. Goldman's Affidavit in Support of Requests for Clerk's Default (the "Goldman Default Affidavit"), Iran refused to accept the Service Packet**.**  Because service by mail could not be

---

[3] FedEx was not delivering packages to Iran at the time service was effectuated.

[4] The Service Packet, in addition to pre-paid postage, contained an envelope, two copies of the summons and complaint and notice of suit, together with a translation in the official language of the foreign state (Farsi), and a certification of same.

[5] We used DHL early in the litigation to expedite the process. As a result of the reimposition of sanctions, we were compelled to use USPS as DHL was unavailable.

effected within 30 days, the Personal Injury Plaintiff proceeded to effect service by diplomatic

channels pursuant to §1608(a)(4).  *See* Jerry S. Goldman's Affidavit of Service (the "Goldman

Affidavit of Service"); *see also* Goldman Default Affidavit; *see also* Clerk's Certificate of

Mailing, all as identified in the following table:

| **CASE NAME:** | *Susan M. King, et al. v. Islamic Republic of Iran* | |
|---|---|---|
| | CASE NO: | No. 1:22-cv-05193 (GBD) (SN) |
| | DATE OF ATTEMPTED SERVICE BY MAIL: | 08/31/2022 |
| | CLERK'S CERTIFICATE OF MAILING-ECF NO.: | ECF No. 14 (docket for individual case) |
| | GOLDMAN AFFIDAVIT OF SERVICE-ECF NO.: | ECF No. 8887 |
| | GOLDMAN DEFAULT AFFIDAVIT-ECF NO.: | ECF No. 8927 |

### 2.    Iran Was Served Via Diplomatic Means

Under 28 U.S.C. § 1608(a)(4), if service cannot be made within 30 days under paragraph

(3), service can be made by sending two copies of the summons and complaint and a notice of

suit, together with a translation of each into the official language of the foreign state, by any

form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court

to the Secretary of State in Washington, District of Columbia, to the attention of the Director of

Special Consular Services—and the Secretary shall transmit one copy of the papers through

diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of

the diplomatic note indicating when the papers were transmitted.

Therefore, pursuant to 28 U.S.C. § 1608(a)(4), after service by mail was rejected, the

Personal Injury Plaintiff delivered to the Clerk of the Court for the U.S. District Court for the

Southern District of New York the following items: cover letter, a cashier's check in the amount

of $2,275.00 payable to the U.S. Embassy Bern, copies of the Complaint in English, copies of

the Complaint in Farsi, Notice of Suit in English, Notice of Suit in Farsi, Summons in English,

Summons in Farsi, Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. § 1602, Civil Cover

9

Sheet, Affidavits from translators, and a U.S. Airbill (from FedEx) (collectively, "Service Documents").[6]  The Clerk was requested to transmit these documents to the United States State Department in Washington, D.C.  *Id.*  In accordance with the statute and the protocol of the Department of State, it would, in turn, transmit one copy of the papers through diplomatic channels to the foreign state and send the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.  The Personal Injury Plaintiff met all of those requirements in this case.  *See* Goldman Default Affidavit and Goldman Affidavit of Service.

As set forth in the below table, the Clerk of the Court transmitted the Service Documents to the Secretary of State, Director of Consular Services, Office of Policy Review and Inter-Agency Liaison, United States Department of State for service on Iran under 28 U.S.C. § 1608(a)(4).  *See* Goldman Default Affidavit and Goldman Affidavit of Service.

As evidenced by letter from Jared Hess, Attorney Advisor, Overseas Citizens Services, Office of Legal Affairs, United States Department of State, to Ruby J. Krajick, Clerk of Court, service was effectuated on Iran as set forth in the below table, when the U.S. Department of State, assisted by the Foreign Interests Section of the Embassy of Switzerland in Tehran, delivered the Service Documents to the Iranian Ministry of Foreign Affairs under cover of diplomatic notes, whose number is in the below table.  Pursuant to 28 U.S.C. § 1608(c)(1), in instances of service under § 1608(a)(4), service shall be deemed to have been made "as of the date of transmittal indicated in the certified copy of the diplomatic note."  *See* Goldman Default Affidavit, Goldman Affidavit of Service, Clerk's Certificate of Mailing, and Diplomatic Notes.

 **CASE NAME:**   *Susan M. King, et al. v. Islamic Republic of Iran*

---

[6] Also included were United States Airbills from the State Department to the Embassy in Bern and back, as well as to the Southern District of New York Clerk.

10

| | |
|---|---|
| CASE NO: | No. 1:22-cv-05193 (GBD) (SN) |
| DATE OF DELIVERY OF THE DIPLOMATIC NOTE AND SERVICE DOCUMENTS: | 01/09/2023 |
| DIPLOMATIC NOTE NO: | 1152-IE |
| CLERK'S CERTIFICATE OF MAILING-ECF NO.: | ECF No. 15 (docket for individual case) |
| GOLDMAN AFFIDAVIT OF SERVICE-ECF NO.: | ECF No. 8887 |
| GOLDMAN DEFAULT AFFIDAVIT-ECF NO.: | ECF No. 8927 |

Based on the foregoing, Plaintiffs filed an Affidavit of Service confirming service was effected on Iran on the dates of the diplomatic notes as set forth above.

Because service upon Iran was proper, and because Section 1605B of the FSIA provides subject-matter jurisdiction for the Personal Injury Plaintiff's claims against Iran (*see infra* at 13-17), this Court also has personal jurisdiction over Iran.  *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1020 (2d Cir. 1991); *see also Reed v. Islamic Republic of Iran*, 845 F. Supp. 2d 204, 209 (D.D.C. 2012).  *See* Goldman Declaration at ¶ 17.

### 3.    The Clerk Properly Entered Default Against Iran.

Iran did not file any responsive pleading or otherwise defend the suit.  Fed. R. Civ. P. 55(a) provides that "[w]hen a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." *Id*.

The Personal Injury Plaintiff requested, on the date set forth in the following table, that the Clerk enter default against Iran because:

- Iran was obligated to "serve an answer or other responsive pleading to the complaint within sixty days after service [was effectuated]." 28 U.S.C. § 1608(d);

- Iran was served on the dates set forth in the table; and

- More than sixty (60) days elapsed since service, and Iran failed to file an answer or other responsive pleading, or take any other steps to defend this action.

Upon the Personal Injury Plaintiff's application, the Clerk issued a Certificate of Default as set forth below.

As Iran failed to timely answer or move in response to the duly served summons and complaint, the Clerk of the Court properly issued a Certificate of Default.

| | | |
|---|---|---|
| **CASE NAME:** | *Susan M. King, et al. v. Islamic Republic of Iran* | |
| | CASE NO: | No. 1:22-cv-05193 (GBD) (SN) |
| | DATE OF SERVICE: | 01/09/2023 |
| | DATE OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | 03/14/2023 |
| | ECF NO. OF REQUEST FOR CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 8926 |
| | DATE OF CLERK'S CERTIFICATE OF DEFAULT: | 03/15/2023 |
| | ECF NO. OF CLERK'S CERTIFICATE OF DEFAULT: | ECF No. 8928 |

## II.    THE PERSONAL INJURY PLAINTIFF REQUESTS CLARIFICATION THAT THE SURVIVAL CLAIM INCLUDES CAUSES OF ACTION FOR ASSAULT AND BATTERY AGAINST IRAN

The Personal Injury Plaintiff requests that the Court clarify that the cause of action for survival in *Burnett v. Islamic Republic of Iran*, No. 15-CV-9903 (GBD) (SN) (S.D.N.Y. Feb. 8, 2016), ECF No. 53, as adopted in the short-form complaint in *Susan M. King, et al. v. Islamic Republic of Iran*, No. 1:22-cv-05193 (GBD) (SN) ("*King*"), ECF No. 1 (individual case docket), includes causes of action for assault and battery upon which the Personal Injury Plaintiff may rely upon for his claim for damages. A Court may clarify that a pleading includes certain causes of action and need not require re-service. *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 105 (D.D.C. 2009) (finding service of amended complaint not required under § 1608 where "the defendant foreign state has failed to appear, and is therefore in default, and where the amendment does not add any claims but instead clarifies existing claims") (internal citations omitted); Order, ECF No. 3018 (service of pleading not required when motion "merely

12

clarifies and converts the claims asserted in the original complaint under 28 U.,S.C. § 1605(a)(7) to claims under 28 U.S.C. § 1605A"). Here, all plaintiffs, including injured plaintiffs incorporate by reference all prior paragraphs, including paragraphs relating to injuries. he survival cause of action then states that "[a]s a result of the intentional, malicious, reckless, conspiratorial, criminal, grossly negligent and negligent acts of [Iran] as described herein, those killed on September 11, 2001, were placed in a severe, often prolonged, extreme, traumatic, apprehension of harmful, offensive unwarranted bodily contact, injury and assault. Those murdered suffered intensely severe and offensive harmful bodily contact, personal injury and battery; including but not limited to extreme fear, terror, anxiety, emotional and psychological distress, [ ] and physical and emotional trauma, intentionally inflicted physical pain." *Id.* at ¶ 5067-68. This language plainly includes the elements of assault and battery and specifically mentions those claims by name. The survival count concludes that "Each Plaintiff," not just decedents, seek damages based on the aforementioned wrongful conduct, including assault and battery. *Id.* at ¶ 5070. Indeed, survival claims simply allow otherwise valid claims to continue following a plaintiff's death, but in the event plaintiff is still alive, he or she may simply maintain the original cause of action, in this case assault and battery. 1 N.Y. Jur. 2d Actions § 121 ("no cause of action for injury to person or property is lost because of the death of the person in whose favor the cause of action existed; rather, for any injury, an action may be brought or continued by the personal representative of the decedent"); 1 N.Y. Jur. 2d Actions § 121 (survival statute "does not create a new cause of action but merely provides for the continuance of one already existing.") (citing *Lubin v. Sydenham Hospital*, 181 Misc. 870, 42 N.Y.S.2d 654 (Sup. Ct. N.Y. Cnty. 1943). Accordingly, the Court should clarify that the operative complaint includes causes of action for

assault and battery upon which the Personal Injury Plaintiff may rely for his claim for damages, and re-service on Iran is not required.

### III.   THE COURT HAS SUBJECT-MATTER JURISDICTION OVER THE PERSONAL INJURY PLAINTIFF'S CLAIMS AGAINST IRAN UNDER JASTA.

As the Court is aware, the victims of the terrorist attacks on September 11, 2001 were not solely United States Nationals; however, relief under the State Sponsored Terrorism exception to the FSIA is limited to U.S. Nationals or immediate family members (or functional equivalents) of U.S. National decedents. Nevertheless, this Court's jurisdiction reaches the claims of the Personal Injury Plaintiff who was injured, by virtue of the fact that the terrorist attacks took place on U.S. soil with the largest number of victims being injured or killed only blocks from this courthouse at the World Trade Center complex in lower Manhattan. The Personal Injury Plaintiff identified in Exhibit A is an individual was injured in the September 11, 2001 terrorist attacks and who was not a United States National on September 11, 2001.

The terrorists who carried out the attacks on September 11, 2001 did not differentiate their victims by nationality. Individuals working in the North Tower of the World Trade Center when it was hit were not somehow sequestered based on their citizenship status. The terrorists attacked the United States, and while the vast majority of those who were killed or injured in the orchestrated attacks against the United States were U.S. Nationals, a significant percentage of the victims were not. This does not mean that they were treated differently by the terrorists or that their loved ones did not experience the grief and loss that U.S. Nationals did.

The Personal Injury Plaintiff's claims against Iran are predicated on the FSIA generally, and more specifically, JASTA. The FSIA "supplies the ground rules for 'obtaining jurisdiction over a foreign state in the courts' of the United States." *Fed. Republic of Germany v. Philipp*, 141 S. Ct. 703, 709 (2021) (citing *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S.

14

428, 443 (1989)). Further, the FSIA is "purely jurisdictional in nature, and creates no cause of action." *McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066, 1075 (D.C. Cir. 2012). However, the FSIA "starts with a premise of immunity and then creates exceptions to the general principle." *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1321 (2017) (internal quotations omitted) (citing *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480 (1983)). Thus, a Court is required to find that one of the FSIA's exceptions applies to Iran to establish jurisdiction. *See* 28 U.S.C. § 1604 ("a foreign state shall be immune for the jurisdiction of the courts of the United States…except as provided in sections 1605-1607."). One exception, created in 1996 with the enactment of the Anti-terrorism and Effective Death Penalty Act, 28 U.S.C. § 1605, provides an exception to sovereign immunity when a foreign state has been officially designated as a state sponsor of terror by the United States.  Iran was designated a state sponsor of terrorism on January 19, 1984, and has remained a designee since. This Court has found jurisdiction over Iran and entered numerous default judgments in this case pursuant to that exception to the FSIA.

JASTA confers jurisdiction to this Court to award damages to the estates of non-U.S. national decedents and non-U.S. national family members of those decedents. JASTA includes no requirement that common law claims can only be maintained by U.S. nationals. In fact, JASTA simply states that "a foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which money damages are sought against a foreign state for physical injury to person or property or death occurring in the United States and caused by: 1) an act of international terrorism **in the United States;** and 2) **a tortious act or acts** of the foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, regardless where the tortious act or acts of the foreign

state occurred." *See* § 1605B(b) (emphasis added). Clearly, Congress intended that the only

requirements to maintain common law claims against a foreign sovereign under JASTA are that

the attack *occurred in the United States* and that the foreign state committed a tort. These

jurisdictional requirements are easily met here for the same reasons the Court previously found

jurisdiction over Iran under 28 U.S.C. § 1605A: Namely, that "Plaintiffs have established by

evidence satisfactory to the Court that the Islamic Republic of Iran provided material support and

resources to al Qaeda for acts of terrorism, including the extrajudicial killing of the victims of the

September 11, 2001 attacks" in "the World Trade Center, the Pentagon, and Washington, D.C.

(Shanksville, Pennsylvania)." *See, e.g.*, *In re Terrorist Attacks on Sept. 11, 2001*, No. 03 MDL

1570 (GBD), 2011 WL 13244047, at *39-40 (S.D.N.Y. Dec. 22, 2011) (conclusions of law ¶¶

18, 19, 23) (ECF No. 2515).

Plaintiffs also previously proved, and the Court previously found "a tortious act or acts of

[Iran], or of any official, employee, or agent of [Iran]". For example, the Court found:

> [T]he Islamic Republic of Iran provided material support or
> resources . . . to al Qaeda generally. Such material support or
> resources took the form of, inter alia, planning, funding,
> facilitation of the hijackers' travel and training, and logistics, and
> included the provision of services, money, lodging, training, expert
> advice or assistance, safehouses, false documentation or
> identification, and/or transportation. Beyond the evidence that the
> Islamic Republic of Iran provided general material support or
> resources to al Qaeda, plaintiffs have established that Iran provided
> direct support to al Qaeda specifically for the attacks on the World
> Trade Center, the Pentagon, and Washington, DC (Shanksville,
> Pennsylvania), on September 11, 2001. Such material support or
> resources took the form of, inter alia, planning, funding,
> facilitation of the hijackers' travel and training, and logistics, and
> included the provision of services, money, lodging, training, expert
> advice or assistance, safehouses, false documentation or
> identification, and/or transportation. Such provision of material
> support or resources by various Iranian officials, including, but not
> limited to, Iran's Supreme Leader the Ayatollah Ali Khamenei and

16

his subordinates, by officers of the IRGC/Qods Force, by the
MOIS, and by the intelligence apparatus of the Supreme Leader,
was engaged in by Iranian officials, employees, or agents of Iran
while acting within the scope of his or her office, employment, or
agency.

*See generally, id.* at ¶¶ 18-35.

The Personal Injury Plaintiff here has clearly shown and the Court has already found "a

tortious act or acts of" Iran and an act of international terrorism in the United States for purposes

of finding subject-matter jurisdiction under JASTA.

Importantly, § 1605B acts as a pass through for state law claims.[7]  This Court so-held in

rejecting the Motion to Dismiss filed by the Republic of the Sudan. *See* ECF No. 7942 at 34

("Nothing in § 1605B(b)'s text suggests that the jurisdictional grant is limited to 'U.S.

nationals'—the phrase does not even appear in the subsection."); *see also id.* at 53-54 (rejecting

argument that 1605B is not a "gateway," holding that "Plaintiffs' state law claims are not

preempted.").  The Personal Injury Plaintiff asserts common law claims for assault and battery

that this Court has jurisdiction to hear.

## IV.   IRAN IS LIABLE TO THE PERSONAL INJURY PLAINTIFF UNDER NEW YORK LAW.

The Personal Injury Plaintiff seeks a determination that Iran is liable for assault and

battery based on the same record evidence, and findings of fact and conclusions of law already

---

[7] *See Bank of New York v. Yugoimport*, 745 F.3d 599, 609 n.8 (2d Cir. 2014) ("The FSIA operates as a
pass-through, granting federal courts jurisdiction over otherwise ordinary actions brought against foreign
states. It provides foreign states and their instrumentalities access to federal courts only to ensure uniform
application of the doctrine of sovereign immunity.'); *id.* ("The FSIA contains no express choice of law
provision, but Section 1606 provides that a foreign sovereign 'shall be liable in the same manner and to
the same extent as a private individual under like circumstances.' 28 U.S.C. § 1606."); *Cassirer v.
Thyssen-Bornemisza Collection Found.*, No. 20-1566, 2022 WL 1177497, at *4 (U.S. Apr. 21, 2022)
("Section 1606 directs a 'pass-through' to the substantive law that would govern a similar suit between
private individuals. . . . The provision thus ensures that a foreign state, if found ineligible for immunity,
must answer for its conduct just as any other actor would.")

made by the Court, and seeks an extension of liability judgments rendered under Section 1605A. As discussed below, New York law applies. Iran clearly is liable to the Personal Injury Plaintiff's common law claims for assault and battery.

> **A.    Iran Is Liable to the Personal Injury Plaintiff for Assault and Battery Under New York Law, Which Applies Because He Was Injured At The World Trade Center.**

Under New York law,[8] to recover damages for assault, there must be proof of physical conduct placing the plaintiff in imminent apprehension of harmful contact." *Fugazy v. Corbetta*, 34 A.D.3d 728, 729 (2006).  To recover damages for battery, there must be bodily contact, made with intent, that is offensive in nature. *Id.*  The elements of both assault and battery are satisfied here, as the September 11th terrorist attacks placed the Personal Injury Plaintiff in imminent apprehension of harmful contact and resulted in intentional, offensive bodily contact that caused devastating personal injury, as set forth below.  As this Court previously found, "plaintiffs have established that the 9/11 attacks were caused by [Iran's] provision of material support to al Qaeda."  *See In re Terrorist Attacks on Sept. 11, 2001*, No. 03 MDL 1570 (GBD), 2011 WL 13244047, at *41 (S.D.N.Y. Dec. 22, 2011), ECF No. 2515 at ¶ 28 ("The IRGC has a special foreign division, known as the *Qods* (or *Quds* or "Jerusalem") Force, which is the arm of the IRGC that works with militant organizations abroad and promotes terrorism overseas."); *id.* at ¶ 29 ("For more than two decades, the IRGC has provided funding and/or training for terrorism operations targeting American citizens, including support for [ ] al Qaeda. In doing so, the IRGC

---

[8] New York common law applies because the Personal Injury Plaintiff was injured at the World Trade Center in New York and is a resident of New York. *See Neumeier v. Kuehner*, 31 N.Y.2d 121, 128 (1972) (If law is "conduct regulating" apply law of place of injury. If law is "loss-allocating" and plaintiff and defendants do not reside in same domicile, which is the case here, generally use place of injury); *Grosshandels-Und Lagerei-Berufsgenossenschaft v. World Trade Ctr. Props., LLC*, 435 F.3d 136, 137 (2d Cir. 2006). ("Given that wrongful death and survival actions relate to loss allocation, . . . and that the parties are domiciled in a number of different states, the presumption is that New York's rules apply.").

is acting as an official agency whose activities are controlled by the Supreme Leader. [ ]. Terrorism training provided to [ ] al Qaeda by the IRGC is an official policy of the Iranian government.");*id.* at ¶ 30 ("The U.S. Treasury Department has designated the *IRGC-Qods* Force as a "terrorist organization" for providing material support to the Taliban and other terrorist organizations, and the U.S. State Department has designated the IRGC as a "foreign terrorist organization."); *id.* at ¶ 34 ("Many of the U.S. State Department reports on global terrorism over the past twenty-five (25) years refer to [Iran's Ministry of Information and Security ("MOIS")] as Iran's key facilitator and director of terrorist attacks."); *id.* at ¶ 40 ("Iranian government ministries are responsible for carrying out the policies of the Iranian government, and the Iranian government's policies include state support for terrorism. Although much of that state support is done through clandestine means, the government ministries have also been involved in state support for terrorism, generally, and in support for al Qaeda [ ], in particular."); *id.* at ¶ 77 ("In 1991 or 1992, discussions in Sudan between al Qaeda and Iranian operatives led to an informal agreement to cooperate in providing support for actions carried out primarily against Israel and the United States."); *id.* at ¶ 78 ("Thereafter, senior al Qaeda operatives and trainers traveled to Iran to receive training in explosives. Osama bin Laden also sent senior aides to Iran for training with the IRG [ ]."); *see generally, id.* at ¶¶ 18-35.  Accordingly, the Personal Injury Plaintiff should be able to recover for damages under the causes of action of assault and battery for the injuries described below.

## V. THE COURT SHOULD ENTER DAMAGES AWARDS AGAINST IRAN AND IN FAVOR OF THE PERSONAL INJURY PLAINTIFF IN AMOUNTS PREVIOUSLY AUTHORIZED.

### A. Personal Injury Damages - Pain and Suffering

This Court has carefully crafted a framework for personal injury damages awards for pain and suffering for plaintiffs who sustained injuries during the September 11, 2001 terrorist attacks. *See* Magistrate Judge Netburn's February 7, 2020 Report and Recommendation, ECF No. 5879, adopted by Judge Daniels' Memorandum Decision and Order, ECF No. 5946. The chief factors to be considered include "the severity of the pain immediately following the injury, the length of hospitalization and the extent of impairment that will remain with the victim for the rest of his or her life." ECF No. 5879, at 3, *quoting O'Brien v. Islamic Republic of Iran*, 853 F. Supp. 2d 44, 46 (D.D.C. 2012).

In briefest form, the Court has defined and categorized what kind of injuries will typically be considered to be: a) "significant"; b) "severe"; or c) "devastating," as follows:

1. "Significant" injuries include: "single broken bones; cuts/lacerations/bruises; mental health disorders; concussions; being covered in dust or debris; significant respiratory ailments including nasal irritations, chest pain, and asthmas from inhalation of smoke, soot and dust; cuts/bleeds; and significant orthopedic injuries such as strains, sprains, or fractures that cause continuing intermittent pain and may require surgery. This category will also include short term or relatively minor non-debilitating physical injuries, or even the absence of serious physical injuries combined with severe emotional injuries." ECF No. 5879 at 6-7.

2. "Severe" injuries include: "multiple broken bones; burns; significant injuries from falling, being buried, or being trampled; severe orthopedic trauma requiring significant or multiple surgeries and/or causing severe constant pain or debilitation; muscular trauma; mental health trauma and disorders; severe head injuries causing frequent headaches, migraines, or some lasting cognitive impairment; and severe pulmonary or neurological traumas." *Id.* at 7.

3. "Devastating" injuries include: "loss of limbs or multiple digits; severe pulmonary traumas; strokes, paraplegia; traumatic brain injuries causing muscle weakness, atrophy, or severe cognitive impairment; significant disfigurement; severe burns covering significant body area; pulmonary traumatic exposures; and acute systemic

trauma.  Injuries causing lasting physical effects severely limiting victims' mobility and activity will generally qualify for this category." *Id.* at 8.

This Court then established "a baseline award of $7 million, an upward deviation of $10 million, and a downward deviation of $5 million for personal-injury damages for pain and suffering arising from injuries sustained on September 11, 2001. The Court, however, reserved its discretion to award further upward departures in exceptional cases." *See* ECF No. 5879 at 6; ECF No. 5955 at 3.

The Court has also reserved discretion to award further upward departures in exceptional circumstances – as where, for example, plaintiffs Grace and Edwin Rivera, a wife and husband who were *together* on September 11, were awarded *twelve* million dollars in damages each in light of the fact that they were each devastatingly injured and each "suffered through the experience together."  *See* Memorandum Decision and Order, February 14, 2020, ECF No. 5955, 1-3.  *See also* ECF No. 5955, at 3-4 (awarding *twenty-five* million dollars in damages for injuries that were "beyond devastating" in the case of Lauren Manning, who was burned over eighty-five percent of her body and who requires around-the-clock care to this day.  ECF No. 5909, 11-13.)

### 1.    Manu Dhingra

On September 11, 2001 Manu Dhingra was a twenty seven year old supervisor of equities traders for a new firm headquartered in the World Trade Center's North Tower.[9]  As he stepped off the elevator and into his firm's offices that morning, Manu was enveloped for thirty to forty-five seconds by wave of incredible heat that was produced by ignited jet fuel surging down the elevator shaft behind him.  Manu felt as if he were being cooked alive.  The pain was so intense

---

[9] *See* the accompanying Declaration of Manu Dhingra of July 25, 2022 ("Dhingra Dec."), attached to the Goldman Declaration as Exhibit F.

that he wanted to die.  When he looked down, he saw that the skin on his arms had simply melted away.  In all, approximately thirty-five percent of Manu's body surface – including his face – was badly burned.

Friends cajoled the badly weakened Manu to walk down eighty-three flights of stairs and to exit the World Trade Center before the Towers fell.  His face was charred black and swollen to the size of a basketball.  He was rushed to a hospital burn unit where he remained for three weeks.  Healthy skin was grafted onto Manu's hands, arms and right leg.  His treatments were almost unbearably painful.

Manu remains badly disfigured even after all these years.  He is painfully aware that people find it very hard to look at his face.  Once a busy single young Manhattan professional, Manu now lives an isolated existence in his parents' old house, and he ekes out a living selling jewelry from a kiosk at a Long Island mall.

Manu suffers from PTSD.  For ten years following the September 11 attacks, Manu entertained thoughts of suicide.  Psychiatric treatment and medication have helped Manu, but he still struggles with depression, and with the constant fear that somehow he may be attacked again.

For the reasons detailed below, plaintiff Dhingra respectfully submits that his injuries should be placed in the category of "beyond devastating," and that he should be awarded twelve million dollars in damages for his pain and suffering as detailed in Exhibit E to the Goldman Declaration.

**- Dhingra's Life Before 9/11 -**

Manu Dhingra was born on August 28, 1974, in New Delhi, India.  When he was eleven years old his family came to America and initially settled in Elmhurst, Queens.  They moved to

Sayville, Long Island the following year.  Manu graduated from Sayville High School and earned a bachelor's degree in advertising and marketing from the Fashion Institute of Technology.  During his senior year at F.I.T.  Manu was elected and served as Student Body President.[10]

After college, Manu moved into an apartment with a roommate in Gramercy Park.  He entered into and attended Home Depot's Management Training Program for a year.  Home Depot seemed promising to Manu; but this was the beginning of the Dot.com era, and Manu decided that he would try to build a career in business and finance.  He joined a firm called Andover Capital and became an equities trader.  Manu found this work very exciting.  He obtained his Series 7, 55, and 63 licenses, and then passed the Series 24 examination in June of 2001.[11]

In the summer of 2001, a number of people at Andover decided to break away and start their own new firm, called Navena.  Manu was invited to join them, and he accepted.  He supervised the equities traders at Navena, and the plan was for Manu to become a principal in the new firm.  Navena's new offices were located on the 83rd floor of the North Tower of the World Trade Center.  Manu found his new job rewarding.  He felt that his career in finance was off to a great start.  He was also enjoying life as young single professional in Manhattan.  Manu liked going out on the town, and he hoped to meet the right woman to marry and someday have kids with.  He was twenty-seven years old and in good health.  He felt like he was ready to take on the world.  And then everything changed.[12]

---

[10] Dhingra Dec. ¶ 1.

[11] Dhingra Dec. ¶ 2.

[12] Dhingra Dec. ¶ 3.

docs-100609782.1

**- September 11 -**

On September 11, 2001, Manu went to work like he did on any other day.  He took the subway to his office at the World Trade Center.  For some reason, Manu still clearly recalls that when he took the elevator up to his office that day, he caught the eye of a pretty young woman.  She gave him a smile.  Manu remembers that he hoped to bump into her again and to get to know her.[13]

Manu got off the elevator on the 83rd floor of the North Tower.  Manu immediately sensed a very strong vibration and what felt like an incredible wave of heat.  (This was caused by American Airlines Flight 11 crashing into the North Tower, but Manu did not understand what was happening at the time.)[14]

Ignited jet fuel had surged down the elevator shaft just as Manu stepped off the elevator and the doors closed behind him.  As Manu began to step away from the elevator, he felt an incredible blast of heat – a blast that seemed to be thousands of degrees hot – going right through his body.[15]

Manu felt as if he were being cooked alive.  As a reflex, he covered his face with his hands.  He felt piercing pain that was like nothing he had ever experienced before.  As Manu now puts it, he "would not wish that feeling on any living being."  When Manu looked down, he saw that his arms had no skin.  It had melted away.[16]

---

[13] Dhingra Dec. ¶ 4.

[14] Dhingra Dec. ¶ 5.

[15] Dhingra Dec. ¶ 6; *see also* ABC News article "Trade Center Burn Victim Released," Oct. 3, 2001 (included within Dhingra Dec. Ex. D), in which Mr. Dhingra's treating physician estimates that in fact Manu did experience a blast of heat of "thousands of degrees."

[16] Dhingra Dec. ¶ 7.

The extreme heat lasted for what seemed to Manu like thirty to forty-five seconds.  Manu thought he would die during each second, and part of him wanted to die so that the pain would stop. But Manu also thought about how his parents would be devastated if he, their eldest child, were killed, and how he would never get a chance to say goodbye.  The fear Manu experienced in those terrible moments haunts him to this day.[17]

Manu hurried towards his office.  He did not know where else to go.  He fell on the floor from the pain as soon as he entered the room.  He thought that these were his last moments on earth.  Two friends rushed into Manu's office to see if he could walk.  Everyone else in his office was already hurrying towards the staircase in order to evacuate the building.[18]

Manu told his friends that he would try to walk with them.  They then went to the stairwell, which was very narrow, in order to exit the building.  One of Manu's friends walked in front of him and the other walked in back in order to protect him.[19]

People in the stairwell moved to the side and let Manu pass when they saw his condition. Because he had severe burns on his hands which caused him great pain, he could not touch the railings.  He felt weak with exhaustion and needed to rest.  But his friends lied to Manu.  They kept telling Manu that there were only ten more flights of stairs to go before they reached the ground.  In fact, there were dozens of flights of stairs left.  Manu's friends saved Manu's life by fooling him into continuing to walk down the stairs toward safety.[20]

---

[17] Dhingra Dec. ¶ 8.

[18] Dhingra Dec. ¶ 9.

[19] Dhingra Dec. ¶ 10.

[20] Dhingra Dec. ¶ 11.

Manu made it to the lobby before either Tower had collapsed.  But he could not leave at first.  The main door was blocked by falling debris.  Through the windows Manu saw people jumping out of the Towers from high above and being killed when they landed on the pavement. Manu and his friends knew they had to get out immediately.  They hurriedly climbed up to the Concourse Level.  There was a pool of water on the ground there (presumably produced by the building's sprinkler system).  The water exacerbated the terrible pain that Manu was already experiencing because of his burned feet.  It felt to Manu as if his feet were now blanching or boiling.[21]

When Manu looked around, he noticed he had been separated from one of his friends. But his other friend was still by his side.  They finally exited the Trade Center safely near the Century 21 store on Church Street.  Emergency Medical Technicians ("EMTs") saw Manu and immediately put him into a waiting ambulance.  Before the ambulance doors closed, Manu asked his friend to call Manu's mother to let her know what had happened.[22]

**- The Doctors Save Manu's Life -**

The ambulance took Manu to St. Vincent's Hospital.  He was in critical condition and, but for the treatment he was given by the hospital's doctors, he would have quickly died.  Shortly after his arrival, Manu asked a nurse if she had a mirror.  He had not seen his own face since the attack.  The nurse hesitated.  She asked a superior if that was allowed.  After being told that it was permitted, she handed Manu a mirror.[23]

---

[21] Dhingra Dec. ¶ 12.

[22] Dhingra Dec. ¶ 13.

[23] Dhingra Dec. ¶ 14.

26

As soon as Manu looked at his own face, he thought that he would rather be dead than to live looking like he did.  His face was swollen to the size of a basketball and charred black.  His hair was burned, his eyebrows were burned off, and his ears and lips were burned too.[24]

Manu's parents visited him that first night in the hospital.  When his mother first saw Manu, she immediately had to flee the room, crying uncontrollably.  Her reaction validated how bad Manu felt about how he looked.[25]

Manu suffered second-degree burns to his face, and third-degree burns to his back, upper extremities, and right leg.  All in all, approximately 35% of Manu's body surface was badly burned.[26]

The next day, on September 12, 2001, Manu was transferred to the Burn Unit at Weill Cornell-New York Presbyterian Hospital.  He remained there until he was discharged on October 1, 2001.  He was in agonizing pain throughout his hospital stay even though he was given morphine.  (He also had to be fed through a feeding tube.)[27]

The doctors grafted healthy skin onto Manu's hands, arms, and right leg.  They took the skin from both of Manu's thighs.[28]

Manu had to take daily showers.  They were extremely painful.  Even worse, when the doctors removed the stiches from Manu's skin grafts, it felt to Manu as if he were being stabbed with a dagger each time a stitch was taken out.  After a few stiches were removed, Manu told the

---

[24] Dhingra Dec. ¶ 15.

[25] Dhingra Dec. ¶ 16.

[26] Dhingra Dec. ¶ 17.

[27] Dhingra Dec. ¶ 18.

[28] Dhingra Dec. ¶ 19.

doctors to put him under general anesthesia before taking the stitches out, which they agreed to do.  The experience was simply too painful for Manu to endure while he was conscious.[29]

The skin on Manu's face and back peeled off at the hospital, and he lost pigmentation. To this day, Manu's skin does not look like it did before 9/11.  (Attached as Exhibit A to the accompanying Declaration of Manu Dhingra is a true and correct copy of Manu's medical records.)[30]

Manu was shown a lot of love and support in the hospital.  He had frequent visits from coworkers, family, friends, and strangers.  (Attached as Exhibit B to Manu's Declaration is a photo of coworkers visiting Manu in the hospital.) He also received a lot of media attention both in the hospital and once he was discharged.  (Attached as Exhibit C to Manu's Declaration is a photo of him leaving the hospital.) He appeared on television's Oprah, Bill O'Reilly, and Larry King shows with then-Senator Hillary Clinton, Senator Charles Schumer, and Queen Noor of Jordan.  (Attached as Exhibit D to Manu's Declaration are select news articles about Manu's story.)[31]

### - Manu's Partial Recovery -

Manu returned to his Gramercy Park apartment upon first being discharged from the hospital.  But the physical and emotional pain from his injuries proved too much.  So he moved back to his parents' home in Sayville in the spring of 2002.  He did not even try to return to work.  He was still (to use Manu's own words) "in bad shape".[32]

---

[29] Dhingra Dec. ¶ 20.

[30] Dhingra Dec. ¶ 21.

[31] Dhingra Dec. ¶ 22.

[32] Dhingra Dec. ¶ 23.

Manu was dealing with a great deal of pain.  He took prescription pain killers until early 2002.  He could not sleep on his back until the spring of 2002.  He had to wear mesh garments to flatten his skin grafts.  This was extremely uncomfortable, especially during hot weather.[33]

Manu's back, arms, thighs, and ankles are permanently disfigured due to his skin grafts. He has scars all over his body from the burns, and the pigmentation on his face still does not match his regular skin complexion.  He has permanent nerve damage due to the skin grafts.  His body also gets hot very quickly because he cannot sweat through the skin grafts.  And Manu's right "pinky" finger is also permanently disfigured.[34]

### - Psychological Impacts -

Manu has suffered, and continues to suffer, severe emotional distress as a result of the terrorist attacks.  He has been diagnosed with and has been treated for Post-Traumatic Stress Disorder ("PTSD") that was brought about by what he experienced and witnessed on September 11, 2001.[35]

The terror that Manu experienced on September 11, 2001, has never really gone away. He thinks constantly of the attacks.  He is hyperaware of possible danger wherever he goes.  He always looks for exits in case he needs to escape in the event of an attack.  Manu was completely unable to get on an airplane for years after 9/11, and even now whenever he gets on a plane he is scared of crashing.[36]

---

[33] Dhingra Dec. ¶ 24.

[34] Dhingra Dec. ¶ 25.

[35] Dhingra Dec. ¶ 26.

[36] Dhingra Dec. ¶ 27.

For years after 9/11, Manu suffered from terrible insomnia.  Far worse, for about ten years after 9/11, Manu had constant thoughts of committing suicide.[37]

Finally, beginning in 2012, Manu sought help from a psychiatrist.  He now takes medication to help him concentrate and anti-depressants to deal with his depression.  He also sees his psychiatrist regularly.[38]

All this has been a great help to Manu.  But he recognizes that he is far from "cured" of PTSD.  He still lives in constant fear.  He still experiences severe mood swings.  He often feels sad or bleak out of the blue.  As Manu puts it, he "can't fully feel" his own emotions.  He has not been able to cry even once since 9/11.[39]

Manu suffers socially due to the physical and emotional injuries that he sustained on September 11.  People (understandably) stare at his burns and scars, and Manu (also understandably) feels terribly self-conscious.  Because of his emotional issues, Manu has trouble building friendships and romantic relationships.[40]

Before 9/11, Manu Dhingra was an outgoing, happy young man on the rise, without a real care in the world.  All that has changed.  His is now forty-seven years old and he lives with his younger brother in his parents' old house.  He has been unable to meet someone with whom to settle down and start a family.  Indeed, for a long time, Manu had trouble motivating himself just to get out of bed.  And he still finds that he has trouble getting motivated to work and be productive.[41]

---

[37] Dhingra Dec. ¶ 28.

[38] Dhingra Dec. ¶ 29.

[39] Dhingra Dec. ¶ 30.

[40] Dhingra Dec. ¶ 31.

[41] Dhingra Dec. ¶ 32.

On 9/11, Manu was an equities trader who was building a serious career with the potential for substantial income.  Today, he makes a very modest living operating a jewelry kiosk at a mall on Long Island.  He makes enough to get by, but he believes this is far from the life he would have had but for the attacks on 9/11.  The pain, suffering, disfigurement, and terror Manu experienced on that tragic day has changed him forever.

### - The Court Should Award Manu Dhingra *Twelve Million Dollars* in Personal Injury Damages -

Manu Dhingra's injuries should also be characterized as "beyond devastating," for at least four reasons.[42]

First, Manu Dhingra is permanently and badly disfigured.  Approximately 35 percent of his body's surface was badly burned on September 11, including his face.  Manu has lost the pigmentation in his face and on much of the rest of the burned surfaces of his body, and he bears visible scars from multiple skin grafts.  To put it bluntly, people find it very hard simply to look at Manu Dhingra; and Manu knows it, and suffers terribly as a result.

Second, Manu has suffered great emotional and psychological damage as a result of the September 11 attacks.  Once a happy young equities trader on the rise, he is now beset by terrors, depression and loneliness.  He has been diagnosed with PTSD.  For many years after 9/11 he suffered from terrible insomnia, and for about ten years after 9/11 he entertained constant thoughts of committing suicide.  His psychological condition is now improved, thanks to treatment and medication; but Manu still lives in constant fear.  He is hyperaware of potential danger wherever he goes, anticipating a possible attack.  He experiences severe mood swings and

---

[42] Dhingra Dec. ¶ 33.

docs-100609782.1

periods of profound melancholy.  He is also strangely detached from his own feelings; he has not been able to cry even once since September 11.

Third, Manu's medical treatment - like that of most serious burn victims - was especially grueling and painful.

Fourth, Manu's experience on September 11 itself was exceptionally painful and terrifying.  He was engulfed for nearly a minute by jet fuel produced heat likely in the thousands of degrees - so very intense that his skin simply melted away, and so intense that Manu wanted to die rather than to continue to endure the pain.  Then Manu had to walk down eighty-three flights of stairs, in his weakened condition, all the while experiencing almost unspeakable suffering.

As in the case of Edwin Rivera, ECF 5909, at 9, Manu Dhingra's injuries should at a minimum be classified as "devastating" because they include "severe burns, disfigurement, and mental health trauma."  And (although such comparisons are unpleasant to draw) Manu's injuries should be considered to be significantly worse than those of Mr. Rivera and therefore as "beyond devastating."  Mr. Rivera was burned on 24 percent of his body's surface, compared to 35 percent for Manu Dhingra; and, perhaps more important, Manu Dhingra's *face* was burned and badly disfigured, while Mr. Rivera's face (thankfully) was not.  The burden of walking through life with disfigured face is (sadly) an especially heavy one for Manu to bear.

For all these reasons, plaintiff Manu Dhingra respectfully submits that he should be awarded personal injury damages for pain and suffering in the amount of twelve million dollars as set forth in Exhibit E to the Goldman Declaration.

32

**- Economic Damages in the Amount of *$255,582* Should be Awarded to Plaintiff Dhingra -**

As described in more detail in the Goldman Declaration, and the Expert's Declaration (which is Exhibit D to the Goldman Declaration), we obtained, generally through a Freedom of Information Act ("FOIA") request, entire September 11th Victim Compensation Fund ("VCF") files for a substantial number of the *O'Neill* plaintiffs.[43]  Those files, along with other materials provided by the clients, contained various economic expert reports, VCF applications, VCF work papers and distribution plans, VCF determinations, underlying economic documents, and the like.  Using methodology and assumptions described in his declaration, relying on earlier expert reports, determinations by the VCF, and other documents, the Expert prepared up-to-date economic loss expert reports, copies of which are deemed appended to the Expert's Declaration (Exhibit D) and being filed on ECF with access restricted to the Court pursuant to the Court's May 5, 2022 Order, ECF No. 7963, setting forth procedures for filing expert reports ("Expert Reports") in support of default judgments.

Plaintiff Manu Dhingra respectfully submits that for the reasons set forth in the accompanying Expert Report of John Beauzile annexed to Exhibit D of the Goldman Declaration, he should be awarded economic damages of $255,582.

**B.      Punitive Damages**

The Personal Injury Plaintiff is also entitled to punitive damages under the FSIA. 28 U.S.C. § 1605A(c)(4).  In the *Havlish* Report and Recommendation on damages, the magistrate judge explained that a "3.44 ratio 'has been established as the standard ratio applicable to cases

---

[43] We are still awaiting receipt of additional files which has adversely become impacted by both "normal" delays in receiving responses to FOIA requests and COVID.

arising out of' terrorist attacks."  ECF No. 2618 at 13 (quoting *Est. of Bland v. Islamic Republic of Iran*, 831 F. Supp. 2d 150, 158 (D.D.C. 2011)).  This Court adopted that recommendation and awarded punitive damages on each compensatory damages category at a ratio of 3.44 (punitive) to 1 (compensatory).  ECF No. 2623 at 2.  The Court has applied that ratio to awards for plaintiffs in other related cases.  *See*, e.g., ECF No. 3175 at 3 (Magistrate Judge Maas Report and Recommendation to apply a 3.44 punitive multiplier); ECF No. 3229 at 1 (Judge Daniels adopting in its entirety Judge Maas's Report and Recommendation to apply a 3.44 multiplier); ECF No. 3300 at 1 and Exhibits A (Judge Daniels applying 3.44 punitive multiplier to claims in *Ashton*).

However, in *Hoglan*, another case in the *In re Terrorist Attacks on September 11, 2001* multidistrict litigation, Magistrate Judge Netburn recommended that the plaintiffs' request for punitive damages be denied without prejudice.  ECF No. 3363 at 28.  Judge Daniels adopted Magistrate Judge Netburn's Report in its entirety, denying without prejudice the plaintiffs' request for punitive damages.  ECF No. 3384 at 6.

In light of the Court's decision in related litigation to defer determination of punitive damage issues until a later stage of the litigation, the Personal Injury Plaintiff herein requests permission to address the issue of punitive damages at a later date.  *See*, e.g., ECF No. 3666 (Judge Daniels' Order in *Burnett* authorizing plaintiffs to make an application for punitive damages at a later date consistent with any future rulings of the Court).

### C.    Prejudgment Interest

An award of prejudgment interest is within the sound discretion of a trial court and is warranted when plaintiffs are delayed in recovering compensation for non-economic injuries caused by acts of terrorism.  *See Baker v. Socialist People's Libyan Arab Jamahirya*, 775 F.

Supp. 2d 48, 86 (D.D.C. 2011).  This Court awarded the *Havlish* plaintiffs prejudgment interest at a rate of 4.96% on their pain and suffering damages awards, to be calculated from September 11, 2001, until the date of judgment. ECF No. 2618 at 13-14.  This Court, recognizing that prejudgment interest was appropriate in cases such as these cases, adopted the magistrate judge's reasoning, finding that an award of prejudgment interest was appropriate and accepting the rate of 4.96%, as proposed by the *Havlish* plaintiffs' expert.

After the *Havlish* award, plaintiffs in *Ashton* and *Bauer* proposed, and the Court agreed, that prejudgment simple interest at the New York State statutory rate of nine percent per annum was appropriate in cases where the injuries arose in New York and the prejudgment interest used in *Havlish*, 4.96 percent per annum, compounded annually, should be reserved for only those cases where the injuries arose in other states.  *See* ECF Nos. 3229 at 2, 3300 at 1, 3341 at 1.

The Second Circuit has held that New York State's statutory prejudgment interest rate should apply to the damages awarded to World Trade Center complex leaseholders in their litigation against American Airlines and United Airlines brought under the federal Air Transportation Safety and System Stabilization Act ("ATSSSA").  Pub. L. No. 107-42, 115 Stat. 230 (2001) (codified as amended at 49 U.S.C. § 40101); *In re Sept. 11 Litig.*, 802 F.3d 314, 343 (2d Cir. 2015).  In that case, the Second Circuit concluded that a federal cause of action under the ATSSSA must look to state rules concerning prejudgment interest.  *Id.*  Accordingly, the Second Circuit held that New York's statutory prejudgment interest rate of nine percent as opposed to a lower rate crafted under federal law, had to be applied to the plaintiffs' claims related to the 9/11 Attacks.  *Id.*

However, more recently, in *Hoglan*, Magistrate Judge Netburn recommended that the 4.96 percent interest rate for prejudgment interest should be applied to all of the solatium claims.

35

ECF No. 3363 at 28-29.  Judge Daniels adopted Magistrate Judge Netburn's *Hoglan* Report in its entirety and applied the interest rate of 4.96 percent per annum, compounded annually to all of the claims.  ECF No. 3384 at 6.  Thereafter, in *Burnett/Iran II*, the Court again awarded prejudgment interest of 4.96 per annum, compounded annually.

In light of the Court's decisions in *Hoglan* and *Burnett*, applying the 4.96 percent rate to prejudgment interest, the Personal Injury Plaintiff respectfully request that the clerk be directed to award prejudgment interest at the rate of 4.96 percent per annum, compounded annually, running from September 11, 2001, until the date of the judgment.

## VI.    CONCLUSION

For all of the reasons herein, in the Goldman Declaration, and in the papers previously submitted to this Court in support of damages against Iran in this MDL, the Personal Injury Plaintiff respectfully request that this Honorable Court enter an Order:

(1)    clarifying that the cause of action for survival in Amended Complaint, *Burnett v. Islamic Republic of Iran*, No. 15-CV-9903 (GBD) (SN) (S.D.N.Y. Feb. 8, 2016), ECF No. 53, as adopted in the short-form complaint *King*, ECF No. 1 (individual case docket), is a cause of action for both assault and battery upon which the Personal Injury Plaintiff may move for a damages judgment; AND,

(2)    determining that service of process in *King* was properly effected upon Iran in accordance with 28 U.S.C. § 1608(a) for sovereign defendants; AND,

(3)    finding that the Court has subject-matter jurisdiction over the common law claims of the Personal Injury Plaintiff pursuant to 28 U.S.C. § 1605B; AND,

(4)    determining that this Court has subject-matter jurisdiction over Iran under the common law for actions arising out of assault and battery based on the intentional

docs-100609782.1

acts of international terrorism perpetrated on September 11, 2001 that intentionally targeted innocent civilians resulting in personal injury; AND

(5)     entering judgments as to liability for the Personal Injury Plaintiff for his common law claims; AND,

(6)     awarding a compensatory damages judgment to the Personal Injury Plaintiff against Iran for assault and battery commensurate with the injuries sustained during the September 11, 2001 terrorist attacks, in accordance with prior precedent in the U.S. District Court for the District of Columbia in similar cases (and factoring in an upward departure on damages values based on the indelible impact of the September 11, 2001 terrorist attacks); AND,

(7)     awarding the Personal Injury Plaintiff identified in Exhibit A, an award of economic damages in the amount set forth in Exhibit A; AND,

(8)     awarding the Personal Injury Plaintiff prejudgment interest at the rate of 4.96 percent per annum, compounded annually for the period from September 11, 2001 until the date of the judgment for damages; AND,

(9)     granting the Personal Injury Plaintiff permission to seek punitive damages, economic damages, and other appropriate damages, at a later date; AND,

(10)    granting permission for all other Plaintiffs in these litigations not appearing in Exhibit A to submit applications for damages awards in later stages, to the extent such awards have not previously been addressed; AND,

(11)    granting to the Personal Injury Plaintiff such other and further relief as this honorable court deems just and proper.

37

Dated:   New York, New York      Respectfully submitted,
        June 23, 2023

/s/ Jerry S. Goldman
_____
ANDERSON KILL P.C.
Jerry S. Goldman, Esq.
Bruce E. Strong, Esq.
Alexander Greene, Esq.
1251 Avenue of the Americas
New York, NY 10020
Tel:  (212) 279-1000
Fax: (212) 278-1733
Email:   jgoldman@andersonkill.com
        bstrong@andersonkill.com
        agreene@andersonkill.com
*Attorneys for Plaintiffs*

38