UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

In re:

      **TERRORIST ATTACKS ON**
      **SEPTEMBER 11, 2001**


------------------------------------------------------------------X

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC #:** _____
**DATE FILED:** __1/5/2024__

03-MD-01570 (GBD)(SN)

**REPORT &**
**RECOMMENDATION**

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE GEORGE B. DANIELS:**

This document relates to:

      <u>King, et al. v. Islamic Republic of Iran</u>, No. 22-cv-05193

      Plaintiff Manu Dhingra is a New Yorker. As a kid he lived in Queens and then Long

Island, where he attended Sayville High School. <u>See</u> ECF No. 9154-7 at ¶ 1.[1] He studied

marketing at the Fashion Institute of Technology in Manhattan and was elected student body

president his senior year. <u>See id.</u> After college, he shared a Gramercy Park apartment with a

roommate and began making his way in the world of business and finance. <u>See id.</u> at ¶ 2. He

soon landed a job with a new firm on the 83rd floor of 1 World Trade Center. <u>See id.</u> at ¶ 3. Then,

one Tuesday morning, as he was stepping off the elevator onto his office floor, a hijacked plane

struck the building and a blast of heat melted the skin off a third of his body. <u>See id.</u> at ¶¶ 4–7,

17.

      Like many 9/11 survivors, Mr. Dhingra has pursued redress through the courts. To that

end, he now moves for a partial final default judgment against the Islamic Republic of Iran. <u>See</u>

---

[1] Unless otherwise noted, all ECF numbers refer to the main MDL docket, No. 03-md-01570.

ECF Nos. 9152, 9154, 9155, 9156. He asks for the same relief that scores of other injured plaintiffs have received before him. See, e.g., ECF No. 5879.

One thing sets Mr. Dhingra apart from those plaintiffs: he moved here from New Delhi when he was 11 years old and was not a United States national on 9/11. For that reason alone, he is excluded from bringing claims under 28 U.S.C. § 1605A(c), a federal cause of action restricted to U.S. nationals, military personnel, and government employees—and the vehicle plaintiffs in this litigation have used to secure default judgments against Iran.

Mr. Dhingra instead seeks to hold Iran accountable under New York tort law. He requests pain and suffering damages, economic damages, and prejudgment interest. The Court recommends granting Mr. Dhingra's motion in part.

**BACKGROUND**

**I.     The Court Held Iran Liable for the 9/11 Attacks Under 28 U.S.C. § 1605A**

In the twenty years since this multidistrict litigation began, the Court has entered thousands of default judgments against Iran.[2] Each of those judgments was premised on the Court's 2011 decision assessing Iran's role in facilitating the 9/11 Attacks. See In re Terrorist Attacks on Sept. 11, 2001, No. 03-md-01570 (GBD)(SN), 2011 WL 13244047, at *2–36 (S.D.N.Y. Dec. 22, 2011) ["In re 9/11"].

In broad terms, the Court found that Iran had waged an "undeclared war" on the United States "through asymmetrical[] or unconventional strategies and terrorism" via "proxies such as . . . al Qaeda." Id. at *3. It began in the mid-1980s, when Iran developed contingency plans to "disrupt[] the American economic, social, military, and political order." Id. at *20. These plans were designed to avoid conventional warfare and included "a scheme to crash hijacked Boeing

---

[2] The Court assumes familiarity with this litigation and summarizes only the relevant procedural and factual background.

747s into . . . the World Trade Center in New York, and the White House and the Pentagon in Washington, D.C." Id.

Rather than act on its plans independently, Iran entered an "alliance" with Hezbollah and al Qaeda to jointly support terrorism. Id. at *11. Together they organized terrorist training camps in Lebanon and Iran and later a string of global attacks. See id. at *11–16. Each of the three, for example, contributed to the 1998 bombings of the United States embassies in Kenya and Tanzania. See id. at *15; Owens v. Republic of Sudan, 826 F. Supp. 2d 128, 139 (D.D.C. 2011) ("Support from Iran and Hezbollah was critical to al Qaeda's execution of the 1998 embassy bombings.").

Iran's cooperation with al Qaeda continued in the lead up to the 9/11 Attacks. It provided direct support in the form of "planning, funding, facilitation of the hijackers' travel and training, and logistics, and . . . the provision of services, money, lodging, training, expert advice or assistance, safehouses, false documentation or identification, and/or transportation." In re 9/11, 2011 WL 13244047, at *40. For instance, the Iranian government "order[ed] its border inspectors not to place telltale stamps in the passports of . . . future hijackers traveling to and from Afghanistan via Iran"—"aware [that it was] helping operatives who were . . . preparing attacks against the United States." Id. at *16. This practice protected "the operational success of the 9/11 plot" by "prevent[ing] potential confiscation of passports by Saudi authorities" and increasing the probability of securing visas to and entering the United States. Id. at *16–17. By the summer of 2001, an Iranian official was issuing covert warnings that "the plan to crash hijacked civilian airliners into American cities" "had been activated." Id. at *22.

Those warnings were borne out on September 11, 2001, when "nineteen (19) members of the al Qaeda terrorist network hijacked four (4) United States passenger airplanes and flew them

into the twin towers of the World Trade Center in New York City, the Pentagon in Arlington, Virginia, and, due to passengers' efforts to foil the hijackers, an open field near Shanksville, Pennsylvania," killing thousands and injuring countless others. Id. at *1. In the aftermath of the Attacks, Iran "facilitate[ed] the escape of . . . al Qaeda[] leaders and . . . operatives" from Afghanistan, including by providing funding, safehouses, false identification, and transportation. Id. at *40.

On this record, the Court concluded that Iran's "material support" for al Qaeda proximately caused the 9/11 Attacks. Id. at *41. The claims at issue otherwise satisfied 28 U.S.C. § 1605A(c), so the Court held Iran liable for the resulting damages to U.S. national victims and families. See id. at *39–42.

## DISCUSSION

Mr. Dhingra's motion requires the Court to take up a new issue—Iran's liability to non-U.S. nationals under state tort law. Before it can grant Mr. Dhingra any relief, the Court must resolve: (1) whether the Court has jurisdiction over personal injury claims against Iran; (2) whether Iran defaulted; (3) whether Iran is liable for assault and battery; and (4) if so, what damages Mr. Dhingra should be awarded.

The Court's 2011 decision bears on many of these questions. But courts cannot take judicial notice of factual findings made in another case and rely on them "for the truth of the matter asserted." Int'l Star Class Yacht Racing Ass'n v. Tommy Hilfiger U.S.A., Inc., 146 F.3d 66, 70 (2d Cir. 1998) (cleaned up). At the same time, "the FSIA does not require courts to relitigate issues that have already been settled in previous decisions." Lee v. Islamic Republic of Iran, 518 F. Supp. 3d 475, 480 (D.D.C. 2021) (cleaned up). Courts can respect these limits and avoid duplication of effort by taking judicial notice of decisions issued in related cases and "'review[ing] [the underlying] evidence,'" thereby obviating the need for its "'re-presentment.'"

4

Id. (quoting Murphy v. Islamic Republic of Iran, 740 F. Supp. 2d 51, 59 (D.D.C. 2010)). The Court leverages this practice as it answers the fact-bound questions below. See ECF Nos. 2431, 2432, 2433, 2473 (documentary evidence cited in In re 9/11, 2011 WL 13244047).

## I.     The Court Has Jurisdiction

The Foreign Sovereign Immunities Act ("FSIA") "supplies the ground rules for 'obtaining jurisdiction over a foreign state in the courts of this country.'" Federal Republic of Germany v. Philipp, 592 U.S. 169, 175 (2021) (quoting Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 443 (1989)). As its name suggests, the FSIA makes foreign states immune from suit by default, conferring jurisdiction over actions only if they meet strict requirements. Mr. Dhingra's suit clears these hurdles, so the Court has jurisdiction over his claims against Iran.

### A.     Subject Matter Jurisdiction

Under the FSIA, district courts have subject matter jurisdiction over nonjury civil actions brought in personam against foreign states if "one of several enumerated exceptions to immunity applies." Republic of Sudan v. Harrison, 139 S. Ct. 1048, 1053 (2019); see 28 U.S.C. §§ 1330(a), 1604.

Mr. Dhingra identifies 28 U.S.C. § 1605B(b) as the relevant exception to immunity. It provides:

> A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which money damages are sought against a foreign state for physical injury to person or property or death occurring in the United States and caused by
>
> (1)     An act of international terrorism in the United States; and
>
> (2)     A tortious act or acts of the foreign state, or of any official, employee, or agent of that foreign state while acting within the scope of his or her office, employment, or agency, regardless where the tortious act or acts of the foreign state occurred.

Id. § 1605B(b).

Mr. Dhingra's claims plainly satisfy many of 28 U.S.C. § 1605B(b)'s requirements. He is seeking "money damages" from Iran. Id.; see No. 15-cv-09903, ECF No. 53 at 1082–88 (Burnett complaint adopted via short form in King, No. 22-cv-05193, ECF No. 1). Those damages are for "physical injur[ies]" he sustained "in the United States." 28 U.S.C. § 1605B(b); see ECF No. 9154-7 at ¶¶ 5–33; No. 15-cv-09903, ECF No. 53 at 1081. His injuries were "caused" by the 9/11 Attacks. 28 U.S.C. § 1605B(b); see ECF No. 9154-7 at ¶¶ 5–33; No. 15-cv-09903, ECF No. 53 at 1081. And the 9/11 Attacks were "act[s] of international terrorism" on U.S. soil. 28 U.S.C. § 1605B(b); see No. 15-cv-09903, ECF No. 53 at 1081.

One element of 28 U.S.C. § 1605B(b) merits closer attention: the requirement that "a tortious act or acts of the foreign state" "caused" the injury. For FSIA purposes, "a tortious act" includes the "knowing or deliberately indifferent provision of material support to terrorists," and "cause" incorporates "the traditional test for proximate causation[:] . . . 'some reasonable connection between the act or omission of the defendant and the damage which the plaintiff has suffered.'" In re Terrorist Attacks on Sept. 11, 2001, 298 F. Supp. 3d 631, 643, 645 (S.D.N.Y. 2018) (quoting Owens v. Republic of Sudan, 864 F.3d 751, 794 (D.C. Cir. 2017)). In simple terms, there must be a link between a state's support for terrorism and the plaintiff's injuries.

The Court heard evidence linking Iran to the 9/11 Attacks in a 2011 hearing. Based on that record, it found that Iran was "aware[] of[] and involve[d] in[]" al Qaeda's plans and provided "material support" to the terrorist group. In re 9/11, 2011 WL 13244047, at *26, 41. It concluded that Iran's "material support" proximately "caused" the 9/11 Attacks and, by extension, the resulting injuries. Id. at *41; see ECF No. 9154-7; cf. ECF No. 9274 at 3 (concluding that Iran proximately caused latent injuries). The evidence supporting those findings

establishes the last element of 28 U.S.C. § 1605B(b)—that Iran's "tortious act[s]" "caused" Mr. Dhingra's injuries. See ECF Nos. 2431, 2432, 2433, 2473.

Mr. Dhingra's claims meet all the requirements of the 28 U.S.C. § 1605B(b) exception to sovereign immunity and he brings them *in personam* against Iran. See No. 15-cv-09903, ECF No. 53. The Court therefore has subject matter under 28 U.S.C. § 1330(a).[3]

### B.      Personal Jurisdiction

With subject matter jurisdiction established, personal jurisdiction is simply a matter of showing "valid service of process." Mobil Cerro Negro, Ltd. v. Bolivarian Republic of Venezuela, 863 F.3d 96, 104 (2d Cir. 2017) (cleaned up); accord 28 U.S.C. § 1330(b). Service on Iran is governed by the FSIA.

The FSIA specifies four methods of serving foreign states in descending order of preference. See 28 U.S.C. § 1608(a). The first, service by "special arrangement," was impossible because Mr. Dhingra has no such arrangement with Iran. Id. § 1608(a)(1); see ECF No. 9155 at 12. The second, service according to an "international convention on service of judicial documents," was likewise unavailable because there is no service convention between the U.S. and Iran. 28 U.S.C. § 1608(a)(2); see ECF No. 9155 at 12. The third, service by registered "mail," proved ineffective; Mr. Dhingra prepared the requisite documents and the Clerk of Court attempted to mail them, but Iran refused delivery. 28 U.S.C. § 1608(a)(3); see ECF No. 9155 at 13–14. The fourth, service via "diplomatic channels," finally succeeded. 28 U.S.C. § 1608(a)(4); see ECF No. 8887.

---

[3] As noted above, 28 U.S.C. § 1330(a) grants jurisdiction over only "nonjury" actions. Mr. Dhingra's complaint includes a jury demand, but this does not deprive the Court of jurisdiction. See No. 15-cv-09903, ECF No. 53 at 1089; Houston v. Murmansk Shipping Co., 667 F.2d 1151, 1154 (4th Cir. 1982). Where "a complaint contains a request for a jury trial . . . [against a foreign state] defendant," "the sensible practice is simply to strike the jury demand." Houston, 667 F.2d at 1154.

Because Mr. Dhingra properly effectuated service under 28 U.S.C. § 1608(a)(4) on claims within its subject matter jurisdiction, the Court has personal jurisdiction over Iran.

## II.     Iran Defaulted

After the King plaintiffs effectuated service, Iran had "sixty days" to "serve an answer or other responsive pleading." 28 U.S.C. § 1608(d). Iran did not respond or otherwise appear in that time or since. The Clerk of Court properly entered a Certificate of Default against Iran in King on March 15, 2023. See ECF No. 8928.

## III.    Iran Is Liable for Assault and Battery

Mr. Dhingra asks the Court to find Iran liable for assault and battery under New York law. See ECF No. 9155 at 22–24. This represents a notable departure from his complaint, which identified five legal theories—"28 U.S.C. § 1605A," "28 U.S.C. § 1350," "28 U.S.C. § 1605(a)(5)," "wrongful death," and "survival"—but omitted assault and battery. No. 15-cv-09903, ECF No. 53 at 1082–88.[4] At the outset, we contend with the significance of Mr. Dhingra's decision to change tack and pursue causes of action not named in the pleadings.

The default judgment process is driven by facts. The "factual allegations" are what a defaulting defendant "admits," City of New York v. Mickalis Pawn Shop, LLC, 645 F.3d 114, 137 (2d Cir. 2011), and the "factual allegations must themselves be sufficient to establish a right to relief," Sanchez v. Ms. Wine Shop Inc., 643 F. Supp. 3d 355, 365 (E.D.N.Y. 2022) (cleaned up).

The Court's assessment of the facts—and whether they "constitute a legitimate cause of action"—is not limited to the legal theories raised in the complaint. In re Indus. Diamonds

---

[4] The Court declines counsel's invitation to address this issue by "clarify[ing] that the [complaint's] cause of action for survival," ECF No. 9155 at 17—which is explicitly devoted to "those killed on September 11, 2001," No. 15-cv-09903, ECF No. 53 at 1087—is *the* basis for the tort claims Mr. Dhingra, a living person, is asserting.

Antitrust Litig., 119 F. Supp. 2d 418, 420 (S.D.N.Y. 2000) (cleaned up); see Bricklayers & Allied Craftworkers Loc. 2 Albany, N.Y. Pension Fund v. Moulton Masonry & Constr., LLC, 779 F.3d 182, 187–89 (2d Cir. 2015) (analyzing well-pleaded facts to determine default liability without reference to theories asserted in complaint).

In fact, an FSIA plaintiff "d[oes] not have to identify [a] specific source of law in his complaint" *at all*. Oveissi v. Islamic Republic of Iran, 573 F.3d 835, 840 (D.C. Cir. 2009); cf. Owens v. Republic of Sudan, 531 F.3d 884, 894 (D.C. Cir. 2008) (FSIA cases are not subject to "heightened pleading requirement[s]"). He can wait to specify the grounds for liability until "an appropriate time in the litigation," such as a motion for default judgment. Oveissi, 573 F.3d at 840; see, e.g., Est. of Botvin ex rel. Ellis v. Islamic Republic of Iran, 684 F. Supp. 2d 34, 42 (D.D.C. 2010) (inviting plaintiffs to brief Israeli causes of action for purposes of default judgment where complaint listed no Israeli law claims). Even then, the district court retains the power to "determine whether a cause of action is available under state or foreign law," Owens, 826 F. Supp. 2d at 153–54 (analyzing liability under D.C. tort law where complaint listed no D.C. torts), and "determine which body of law governs the plaintiffs' claims," Est. of Botvin ex rel. Ellis, 684 F. Supp. 2d at 39.

Mr. Dhingra followed this precedent to the letter. He pleaded factual allegations that cogently charged Iran with legal responsibility for his injuries:

- "**Iran . . . entered into an alliance with al-Qaeda** . . . to work together to conduct terrorist operations against the United States." No. 15-cv-09903, ECF No. 53 at ¶ 4976.

- Through that partnership, "**Iran . . . had actual foreknowledge of[] . . . the 9/11 [A]ttacks** . . . [,] which were carried out by members of al-Qaeda." Id. at ¶ 5006.

- In the lead up to 9/11, "**Iran . . . assist[ed] in, and contribut[ed] to, the preparation and execution of the plans**" for the Attacks, id. at ¶ 4951, including by providing "instruction, training, direction, financing, and support" to al Qaeda, id. at ¶ 5031.

9

- "**In furtherance of those plans, the al-Qaeda hijackers deliberately caused planes to crash into the World Trade Center Towers,** the Pentagon, and a field in Shanksville, Pennsylvania on September 11, 2001." <u>Id.</u> One of the hijacked planes, "American Airlines Flight 11[,] . . . crashed . . . into the North Tower of the World Trade Center in New York . . . , **causing** the collapse of the tower, the deaths of the 9/11 Decedents, and **injuries** to other plaintiffs," including Mr. Dhingra. <u>Id.</u> at ¶ 5013; <u>see</u> ECF No. 9154-7 at ¶¶ 5–33.

Later, Mr. Dhingra identified assault and battery as appropriate causes of action in his motion for default judgment. <u>See</u> ECF No. 9155 at 22–24. The Court is thus free to draw on these theories of liability as it considers whether Mr. Dhingra has "establishe[d] his right to relief by evidence satisfactory to the [C]ourt." 28 U.S.C. § 1608(e).

First, we confirm that state tort claims can be brought against foreign states. "[A] foreign state, if found ineligible for immunity [under the FSIA], must answer for its conduct just as any other actor would." <u>Cassirer v. Thyssen-Bornemisza Collection Found.</u>, 596 U.S. 107, 114 (2022). In effect, the FSIA acts as "a 'pass-through' to the substantive law that would govern a similar suit between private individuals." <u>Id.</u> (quoting <u>Oveissi</u>, 573 F.3d at 841); <u>see</u> <u>In re Terrorist Attacks on Sept. 11, 2001</u>, No. 03-md-01570 (GBD)(SN), 2023 WL 5132138, at *12 (S.D.N.Y. Aug. 10, 2023) (citing <u>Leibovitch v. Islamic Republic of Iran</u>, 697 F.3d 561, 572 (7th Cir. 2012), and <u>Owens</u>, 864 F.3d at 809, in support of viability of state law claims against Sudan). Accordingly, Iran is subject to suit for assault and battery.

Second, we determine the applicable state law. We follow New York choice-of-law doctrine because Mr. Dhingra filed his complaint in this District. <u>See</u> <u>Menowitz v. Brown</u>, 991 F.2d 36, 40 (2d Cir. 1993) (explaining that MDL courts apply the choice-of-law rules of "the jurisdiction in which the action was filed"); No. 22-cv-05193, ECF No. 1.

New York has different choice-of-law rules for "loss-allocating" and "conduct-regulating" torts. <u>See</u> ECF No. 9287 at 3–5 (discussing rules for each). Which rules apply to

assault and battery claims is unclear, however, because those torts exhibit features of "loss allocation as well as of conduct regulation." K.T. v. Dash, 37 A.D.3d 107, 113 (1st Dep't 2006) (discussing "intentional assault"). Fortunately, we do not need to pick one regime or the other.

Under either framework, the law of the "place of the tort" controls. See ECF No. 9287 at 3–5 (applying, in turn, each set of rules to the common facts in this litigation). That translates to the jurisdiction "where the last event necessary to make the [defendant] liable occurred," even if "the defendant's . . . [mis]conduct occur[red] . . . in another [jurisdiction]." Schultz v. Boy Scouts of Am., Inc., 65 N.Y.2d 189, 195 (1985). Because Mr. Dhingra was injured in the first World Trade Center attack, the "last event necessary to make [Iran] liable" occurred in New York, when hijackers crashed Flight 11 into the North Tower. Id.; see ECF No. 9154-7 at ¶¶ 5–8. Accordingly, the Court applies New York tort principles here.

**Third**, we consider how Mr. Dhingra's evidence stacks up against New York assault and battery standards. Assault and battery claims turn on largely overlapping elements. Committing an "assault involves putting" the plaintiff in "fear" or apprehension of a battery. Rivera v. State, 34 N.Y.3d 383, 389 (2019) (cleaned up). A battery, in turn, requires someone to "intentionally" and "unjustifiably" "cause" harmful or offensive "contact" with the plaintiff. Id. (cleaned up). Qualifying contact can be made by the person himself or "by means of an instrumentality." Aberbach v. Biomedical Tissue Servs., Ltd., 48 A.D.3d 716, 718 (2d Dep't 2008).

Importantly, liability for assault and battery extends beyond the principal tortfeasor to those who aided and abetted him.[5] See Lindsay v. Lockwood, 625 N.Y.S.2d 393, 396–98 (N.Y. Sup. Ct. 1994). To prevail on an aiding and abetting theory, the plaintiff must show that: (1) a third party's "wrongful act" injured the plaintiff, (2) the defendant "knowingly and substantially

---

[5] The Court does not address alternative theories of liability, such as conspiracy, because it recommends holding Iran liable under aiding-and-abetting principles.

assisted" the third party's misconduct, and (3) the defendant was "aware of his role" in "tortious activity" when he gave that assistance. Id. at 397 (cleaned up); accord Halberstam v. Welch, 705 F.2d 472, 477 (D.C. Cir. 1983). A defendant's assistance may come in "words or [actions]," McKiernan v. Vaccaro, 168 A.D.3d 827, 830 (2d Dep't 2019), but regardless must "connect[]" him to the misconduct that "caus[ed] the injury," Lindsay, 625 N.Y.S.2d at 397. When deciding whether a defendant's conduct meets this standard, New York courts consider "'the nature of the act encouraged, the amount of assistance given by the defendant, his presence or absence at the time of the tort, his relations to the [tortfeasor,] and his state of mind.'" Id. (quoting Restatement (Second) of Torts § 876, cmt. d (Am. L. Inst. 1979)).

In plain terms, Iran is liable for aiding and abetting assault and battery if: (a) al Qaeda intentionally used a hijacked aircraft to injure and inspire fear in 9/11 victims, including Mr. Dhingra; and (b) Iran knew of al Qaeda's plan to attack the United States and gave the terrorist organization substantial help in carrying out its strike. The evidence plaintiffs presented in 2011, combined with Mr. Dhingra's affidavit and medical records, leaves little room for debate on either point. See In re 9/11, 2011 WL 13244047; ECF No. 9154.

The plaintiffs' evidence establishes that the 9/11 hijackers committed assault and battery. Al Qaeda operatives turned passenger planes into ordnance and used them to bring down the Twin Towers, terrorizing and injuring thousands within the collapse zone. See In re 9/11, 2011 WL 13244047, at *1. Mr. Dhingra was in the North Tower when Flight 11's impact sent exploding jet fuel down the elevator shaft and onto his floor, where he burned alive for a 30-second eternity. See ECF No. 9154-7 at ¶¶ 5–8. The fear and physical trauma he experienced were unquestionably "intentional and offensive," Rivera, 34 N.Y.3d at 389—the direct product

of al Qaeda's use of an aircraft as an "instrumentality" of destruction, <u>Aberbach</u>, 48 A.D.3d at 718.

The plaintiffs' uncontroverted submissions similarly establish that Iran aided and abetted the Attacks. Iran knew of "the plan to crash hijacked civilian airliners into American cities." <u>In re 9/11</u>, 2011 WL 13244047, at *22. "Iran provided direct support to al Qaeda specifically for th[ose] attacks" in the form of "planning, funding, facilitation of the hijackers' travel and training, and logistics, and . . . the provision of services, money, lodging, training, expert advice or assistance, safehouses, false documentation or identification, and/or transportation." <u>Id.</u> at *40. That support "vastly increased the likelihood of the operational success of the 9/11 plot." <u>Id.</u> at * 16. New York courts have deemed people liable for aiding and abetting battery based on far less "substantial" assistance. <u>Lindsay</u>, 625 N.Y.S.2d at 397; <u>see, e.g.</u>, <u>Wilson v. DiCaprio</u>, 278 A.D.2d 25 (1st Dep't 2000) (affirming liability for assault and battery where defendant shouted encouragement for principal tortfeasors).

Altogether, this evidence "satisfactory[ily]" "establishes" the elements of assault and battery under New York law.[6] 28 U.S.C. § 1608(e). Accordingly, the Court recommends entering a liability judgment in favor of Mr. Dhingra against Iran.

## IV.   Mr. Dhingra Is Entitled to Damages

Victims of assault and battery can recover compensatory and in some cases punitive damages under New York law. <u>See</u> <u>Allam v. Meyers</u>, 906 F. Supp. 2d 274, 286–94 (S.D.N.Y. 2012); Restatement (Second) of Torts § 924 (Am. L. Inst. 1979). Mr. Dhingra does not request

---

[6] The Court has previously explained that it will not *sua sponte* invoke affirmative defenses, such as the statute of limitations, on behalf of absent defendants. <u>See</u> ECF No. 8973 at 8 (citing <u>Davis v. Bryan</u>, 810 F.2d 42, 44 (2d Cir. 1987); <u>Sec. & Exch. Comm'n v. Amerindo Inv. Advisors</u>, 639 F. App'x 752, 754 (2d Cir. 2016); <u>Maalouf v. Islamic Republic of Iran</u>, 923 F.3d 1095, 1114–15 (D.C. Cir. 2019)). As such, any potential defenses to Iran's liability under New York tort law do not preclude judgment here.

the latter—deferring the question of punitive damages until a later date. His motion exclusively seeks compensatory damages for the pain and suffering and economic harm traceable to his injuries. See ECF No. 9155 at 36–38.

The Court has written extensively about pain and suffering awards for personal injuries in the 28 U.S.C. § 1605A(c) context. In the Burnett I Report and Recommendation, ECF No. 5879, it set out a now-familiar framework that divides injuries into three categories with corresponding damages: a baseline award ($7,000,000) for "severe" injuries, a downward departure ($5,000,000) for "significant" injuries, and an upward departure ($10,000,000) for "devastating" injuries. Id. at 6–10. For rare individuals with exceptionally traumatic injuries, the Court has recommended damages above $10 million. See, e.g., ECF No. 5909 at 11–13 (awarding damages of $25,000,000 to a plaintiff whose injuries were "beyond devastating"). Conversely, "[t]he absence of medical records supporting and providing further information regarding an affiant's claims may support a downward departure in an award determination." ECF No. 5879 at 9.

The Court sees every reason to apply this framework to state law claims. Doing so will promote the efficient adjudication of this litigation and, more importantly, restore a measure of parity to plaintiffs of different nationalities. As Mr. Dhingra's story illustrates, the 9/11 Attacks did not just devastate U.S. nationals and their families; they killed 372 people from over 90 countries and injured many more.[7] And yet, non-U.S. nationals have not shared in the default judgments entered against Iran in this litigation—largely due to legal hurdles unique to their claims. As we parse these issues and grant judgments in favor of non-U.S. national plaintiffs, justice demands that we honor their losses as we do those of U.S. nationals. Accordingly, the Court applies the Burnett I framework to Mr. Dhingra's request for pain and suffering damages.

---

[7] See Why September 12 Matters So Much, U.S. Embassy in Geor. (Sept. 9, 2020), https://ge.usembassy.gov/why-september-12-matters-so-much/.

**Manu Dhingra** was arriving at his new offices in the North Tower when Flight 11 crashed into the building some 10 floors above him. See ECF No. 9154-7 at ¶ 5. Jet fuel exploded down the elevator shaft at nearly 1000 degrees, and "an incredible blast of heat" engulfed Mr. Dhingra "for what seemed like thirty to forty-five seconds." Id. at ¶¶ 5–8; see ECF No. 9154-6 at 9. He was "cooked alive." See ECF No. 9154-7 at ¶ 7. "As a reflex, [he] covered [his] face with [his] hands." Id. "When [he] looked down, [he] saw that [his] arms had no skin. It had melted away." Id.

Everyone on the 83rd floor of the North Tower understood that help would probably never reach them. See ECF No. 9154-6 at 12. They had to rescue themselves. Mr. Dhingra walked down flight after flight of stairs on burned feet, his coworkers flanking him in front and back to prevent others from brushing against his charred skin. See ECF No. 9154-7 at ¶¶ 10–11. They made it out before either tower fell. See id. at ¶ 12. Mr. Dhingra was spotted by first responders, put in an ambulance, and taken to the hospital. See id. at ¶¶ 13–14.

He had sustained second- and third-degree burns to 35% of his body, including his face. See id. at ¶ 17. Doctors treated his most serious burns with skin grafts and, after three weeks of often "agonizing" treatment, released him from inpatient care. Id. at ¶¶ 18–20. He was left with "permanent nerve damage" and "disfigured" skin on his hands, "back, arms, thighs, and ankles." Id. at ¶ 25. He has also been diagnosed with and treated for post-traumatic stress disorder. Id. at ¶¶ 26–29. Medical records and media coverage confirm these conditions. See ECF No. 9154.

Mr. Dhingra's "severe burns covering significant body area" qualify as "devastating" injuries. ECF No. 5879 at 8. The Court therefore recommends awarding him $10 million in pain and suffering damages. This amount is commensurate with awards for plaintiffs with similar

injuries. <u>See</u> ECF No. 7323 at 39 (recommending $10 million award for plaintiff with second-
and third-degree burns over 35% of his body).

Mr. Dhingra also seeks compensation for his economic losses. His request is supported
by a report from economist John Beauzile, <u>see</u> ECF No. 9154-10, on whose analyses the Court
has based prior awards, <u>see, e.g.</u>, ECF No. 9168, <u>adopted at</u> ECF No. 9213. The Court credits
this report and recommends awarding Mr. Dhingra economic damages of $255,582. <u>See</u> ECF
No. 9154-10 at 3.

## CONCLUSION

The Court recommends granting Mr. Dhingra's motion in part; entering a partial final
judgment against Iran in his favor; and awarding him $10,000,000 in pain and suffering and
$255,582 in economic damages.

Mr. Dhingra should be awarded prejudgment interest at a rate of 4.96 percent per annum,
compounded annually. <u>See</u> ECF Nos. 3362, 9155 at 39–41. Interest on his pain and suffering
damages should run from September 11, 2001, until the date of judgment. Interest on his
economic damages should run from September 1, 2022, until the date of judgment. <u>See</u> ECF No.
9154-10 at 3.

All <u>King</u> plaintiffs, including Mr. Dhingra, should be permitted to submit further
applications for damages, including punitive damages, consistent with any future rulings of the
Court.

SARAH NETBURN
United States Magistrate Judge

DATED:       January 5, 2024
             New York, New York

16

\*            \*            \*

## NOTICE OF PROCEDURE FOR FILING OBJECTIONS
## TO THIS REPORT AND RECOMMENDATION

The parties shall have 14 days from the service of this Report and Recommendation to file written objections under 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See Fed. R. Civ. P. 6(a), 6(d). A party may respond to another party's objections within 14 days after being served with a copy. Fed. R. Civ. P. 72(b)(2); see Fed. R. Civ. P. 6(a), 6(d). These objections shall be filed with the Court and served on any opposing parties. See Fed. R. Civ. P. 72(b)(2). Courtesy copies shall be delivered to the Honorable George B. Daniels if required by that judge's Individual Rules and Practices. Any requests for an extension of time for filing objections must be addressed to Judge Daniels. See Fed. R. Civ. P. 6(b). The failure to file timely objections will waive those objections for purposes of appeal. See Thomas v. Arn, 474 U.S. 140 (1985); United States v. James, 712 F.3d 79, 105 (2d Cir. 2013).